# EXHIBIT B

# SPENCER CAPITAL HOLDINGS LTD.

## INSTRUCTIONS TO INVESTORS

Enclosed you will find a <u>Subscription Agreement</u> pertaining to the offering of Class A Preference Shares ("Shares") of Spencer Capital Holdings Ltd., an exempted company incorporated in Bermuda (the "Company"), and a <u>Joinder</u> to the Company's Shareholders Agreement and Registration Rights Agreement. In addition, as Exhibits hereto, are: <u>Exhibit A</u> – Second Amended and Restated Bye-Laws of the Company; <u>Exhibit B</u> – Shareholders Agreement; <u>Exhibit C</u> – Registration Rights Agreement; and <u>Exhibit D</u> – Memorandum of Association of the Company.

To subscribe, please:

- Execute the Subscription Agreement at page 17 thereof;

- Complete Schedule A (on the immediate next page);

- Execute <u>Schedule B</u> on page 3 and complete the table at the bottom of <u>Schedule B</u>.

EACH PROSPECTIVE INVESTOR IN THE COMPANY SHOULD EXAMINE THE ENCLOSED DOCUMENTS PERTAINING TO THE COMPANY AND THE OFFERING OF SHARES AND EVALUATE THE SUITABILITY OF THIS INVESTMENT IN THE CONTEXT OF HIS/HER/ITS OWN NEEDS, INVESTMENT OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS/HER/ITS OWN INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH PROSPECTIVE INVESTOR IS ENCOURAGED TO CONSULT WITH HIS/HER/ITS ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT OR OTHER BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED INVESTMENT.

If you desire to purchase Shares, then please (1) execute and deliver the enclosed Subscription Agreement and Joinder to the Shareholders Agreement and Registration Rights Agreement to Dowling Hales, 521 Fifth Avenue, Suite 610, New York, NY 10175, Attn: Anthea Sukraj and (2) contact Anthea Sukraj at 212.592.5700 or ASukraj@dowlinghales.com to receive Wire Transfer Instructions.

Upon receipt of the signed Subscription Agreement and Joinder to the Shareholders Agreement and Registration Rights Agreement and acceptance of your subscription by the Company (the Company reserves the right, in its sole discretion, to accept or reject a subscription for any reason whatsoever), the Company will notify you of receipt and acceptance of your subscription.

**<u>Important Note</u>: The person or entity actually making the decision to invest in the Shares should complete and execute the Subscription Agreement and Joinder to the Shareholders Agreement and Registration Rights Agreement. For example, retirement plans often hold certain investments in trust for their beneficiaries, but the beneficiaries may maintain investment control and discretion. In such a situation, the beneficiary with investment control must complete and execute the Subscription Agreement and Joinder to the Shareholders Agreement and Registration Rights Agreement (this also applies to trusts, custodial accounts and similar arrangements).**

Execution Version

# SPENCER CAPITAL HOLDINGS LTD.

## CLASS A PREFERENCE SHARE
## SUBSCRIPTION AGREEMENT

**Dated as of March _____, 2015**

## CLASS A PREFERENCE SHARE SUBSCRIPTION AGREEMENT

CLASS A PREFERENCE SHARE SUBSCRIPTION AGREEMENT (this "*Agreement*"), dated as of March _____, 2015, by and among Spencer Capital Holdings Ltd., a company organized under the laws of Bermuda (the "*Company*"), and each of the Persons (as defined below) listed on Schedule A hereto (each, an "*Investor*" and collectively, the "*Investors*").

WHEREAS, the Company is a holding company which markets and sells reinsurance products, provides captive management services and asset management services and is engaged in certain acquisition activities to acquire a collection of affiliated companies operating as an independent provider of finance and insurance products and services through its subsidiaries; and

WHEREAS, the Company desires to issue and sell to the Investors shares (the "*Shares*") of the Company's authorized but unissued Class A Preference Shares, $.0001 par value per share (the "*Class A Preference Shares*"), and the Investors, severally and not jointly, desire to purchase the Shares on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties, covenants and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Purchase and Sale.

1.1    Sale and Issuance of Shares. In consideration of and in express reliance upon the representations, warranties and covenants set forth herein and in the Related Documents (as defined below) and subject to the terms and conditions set forth in this Agreement, the Company shall issue and sell to each Investor, and each Investor, severally and not jointly, shall purchase from the Company, that number of Shares set forth opposite the name of such Investor under the heading "*Shares*" on Schedule A for the aggregate purchase price set forth opposite the name of such Investor under the heading "*Purchase Price*" on Schedule A.

1.2    Authorization of Shares.  Prior to the Initial Closing (as defined below), the Company shall have authorized: (i) the sale and issuance of the Shares to the Investors and (ii) the issuance of, and reserved and set aside for issuance, the Common Shares of the Company, $.0001 par value per share (the "*Common Shares*"), to be issued upon conversion of the Shares (the "*Conversion Shares*").

1.3    Closing.

(a)    Subject to Sections 4 and 5 hereof, payment for and delivery of the Shares to be purchased at the Initial Closing shall take place at the offices of the Company, at 10:00 a.m. Eastern Time on the date hereof, or at such other time, date or place as the Company and the Investors purchasing a majority of the Shares at the Initial Closing shall mutually agree (which time, date and place are referred to in this Agreement as the "*Initial Closing*").

1

(b)     The Company may offer to the Investors or, subject to the preemptive rights of the Investors and Shareholders (as defined in the Shareholders Agreement) as provided in the Shareholders Agreement, to one or more third parties (each, an "*Additional Investor*"), the right to participate in the sale and issuance of the Shares pursuant to this Agreement. The Company may sell to any Additional Investors, at one or more subsequent Closings to be held at such time, date or place as the Company and the Additional Investors may agree (each, a "*Subsequent Closing*" and, together with the Initial Closing, a "*Closing*"), up to the balance of the authorized Shares not purchased at the Initial Closing. In the event that there is more than one Closing, (i) the term "Closing" shall apply to each such Closing, except with respect to the representations and warranties contained in Section 2 which shall apply only to the Initial Closing, (ii) the term "Shares" shall apply to all Class A Preference Shares of the Company sold and issued at each such Closing, (iii) the term "Investor" shall refer to each Investor that purchases Shares at the Initial Closing and to each Additional Investor and (iv) Schedule A shall be revised by the Company (without any requirement of consent of the Investors) to reflect any sales of additional Shares made at each such Closing and the Purchase Price applicable thereto. Each Additional Investor shall execute a joinder to this Agreement and become a party hereto as an "Investor" for all purposes hereunder.

(c)     At each Closing, the Company shall deliver to each Investor a certificate or certificates, registered in the name of such Investor, representing the number of Shares to be purchased by such Investor as set forth opposite the name of such Investor on Schedule A against delivery to the Company by the Investor of the purchase price therefor in immediately available funds by wire transfer to an account or accounts designated by the Company. The Company acknowledges and confirms that, upon consummation of each Closing, each Investor shall have full legal ownership of the Shares issued to it at such Closing and all right, title and interest in and to such Shares as of the date of such Closing.

1.4     Stamp Duties or Taxes. No stamp, transfer or similar duties or taxes are payable in respect of the offer, issuance, sale and delivery of the Shares to any Investor, provided that any such Investor is not a resident of Bermuda for Bermuda exchange control purposes.

2.     Representations, Warranties and Covenants of the Company.

As a material inducement to the Investors to enter into and perform their respective obligations under this Agreement, the Company represents and warrants to and agrees with each Investor as of the Initial Closing as follows:

2.1     Organization and Standing. The Company is duly organized, validly existing and in good standing under the laws of Bermuda and has all requisite power and authority to carry on its business as now conducted and as currently proposed to be conducted.

2.2     Capitalization.

(a)     The authorized capital of the Company consists of: (i) 10,000,000 Class A Preference Shares, (A) 3,031,604 of which are issued and outstanding prior to the Initial Closing, (B) 564,500 of which are reserved for issuance upon exercise of warrants and (C) up to 3,750,000 of which are to be issued at the Closing and (ii) 12,000,000 Common Shares, (A) none of which are issued and outstanding prior to the Initial Closing, (B) 7,346,104 of which are reserved for issuance upon conversion of the Class A Preference Shares and (C) 94,444 of which are reserved for issuance under the Company's 2011 Share Issuance Plan.

2

(b)    *"Company Shares"* means the authorized shares, including all classes of common shares and preference shares, voting and nonvoting, in the share capital of the Company.

(c)    All outstanding Company Shares have been duly and validly authorized and issued, are fully paid and non-assessable and have been issued in accordance with the registration or qualification provisions of the United States Securities Act of 1933, as amended (the *"Securities Act"*) and the relevant securities laws of Bermuda and any state or other jurisdiction or pursuant to valid exemptions therefrom.

(d)    The Company has authorized and reserved, and covenants to continue to reserve, free and clear of preemptive and other preferential rights, a sufficient number of its previously authorized but unreserved Common Shares to satisfy the Investors' rights of conversion with respect to the Shares as set forth in the Second Amended and Restated Bye-laws, in the form attached hereto as Exhibit A (the *"Bye-laws"*).

(e)    Except as set forth in the Bye-laws, the Shareholders Agreement in the form attached hereto as Exhibit B (the *"Shareholders Agreement"*) and this Agreement (i) there are no subscriptions, options, warrants, phantom share rights, share appreciation rights, conversion privileges, preemptive rights or other rights (contingent or otherwise) to purchase or acquire any of the authorized but unissued share capital of the Company, (ii) the Company has no obligation to issue shares, subscriptions, warrants, options, convertible or exchangeable securities, or other such rights or to distribute to holders of any of its equity securities any evidence of indebtedness or any of its assets, (iii) the Company has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its equity securities or any interest therein or to pay any dividend or make any other distribution in respect thereof and (iv) there are no agreements between the Company and any of its shareholders concerning the voting of the Company's outstanding shares.

(f)    The designations, powers, preferences, rights, qualifications, limitations and restrictions of the Company Shares are as stated in the Bye-laws and all such designations, powers, preferences, rights, qualifications, limitations and restrictions are valid, binding and enforceable in accordance with all Applicable Laws (as defined below).

2.3    Subsidiaries.  The Company owns one hundred percent (100%) of the issued and outstanding common equity securities of (i) Spencer Re, I.I., a Puerto Rico company, (ii) Spencer Capital Advisors, Inc., a Delaware corporation, (iii) Spencer Capital Financial Holdings, LTD., a Bermuda company, and (iv) Spencer Holdings Delaware, Inc., a Delaware corporation (collectively, the *"Subsidiaries"*), free and clear of any liens or encumbrances. Spencer Capital Management, LLC, a Delaware limited liability company, is an affiliate of the Company. Except for the foregoing, the Company does not otherwise (a) own of record or beneficially, directly or indirectly, (i) any shares, securities convertible or exchangeable into shares or any other equity interest or debt security of any corporation or (ii) any equity interest or debt security in any partnership, joint venture or other non-corporate entity or (b) control, directly or indirectly, any other entity.

3

2.4     Authorization; Enforceability.

(a)     The Company has all requisite corporate power and authority to execute, deliver and perform, as applicable, this Agreement and the Joinder, in the form attached hereto as Schedule B, to the Shareholders Agreement and Registration Rights Agreement with each Investor (the "*Related Documents*").  Copies of the Shareholders Agreement and Registration Rights Agreement and Memorandum of Association are set forth as Exhibits B, C and D respectively.

(b)     All action on the part of the Company and its officers, directors and shareholders necessary for (i) the authorization, execution, delivery and performance of all obligations of the Company under each of this Agreement and the Related Documents has been taken and (ii) the issuance and sale by the Company of the Shares hereunder has been taken. Each of this Agreement and the Related Documents constitutes a valid and legally binding obligation of the Company, enforceable in accordance with its terms, except (A) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally or by equitable principles, (B) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (C) to the extent that the enforceability of the indemnification provisions may be limited by applicable laws.

2.5     Validity of Shares and Issuance.

(a)     The Shares (i) are duly authorized, (ii) when issued and sold to the Investors will be validly issued, (iii) after receipt of all consideration due therefor, will be fully paid and non-assessable and (iv) will be free and clear of any and all liens or encumbrances except as set forth in this Agreement, the Shareholders Agreement, the Registration Rights Agreement, the Bye-Laws or as otherwise created by the Investors.

(b)     The Conversion Shares (i) have been duly and validly reserved for issuance upon conversion, (ii) are duly authorized and, when issued in compliance with the provisions of the Bye-laws will be validly issued and fully paid and (iii) will be free and clear of any and all liens or encumbrances except as set forth in this Agreement, the Shareholders Agreement, the Registration Rights Agreement, the Bye-Laws or as otherwise created by the Investors.

2.6     Litigation.  There is no action, suit, proceeding or investigation pending or, to the Company's knowledge (as defined below), currently threatened against the Company or, to the Company's knowledge, against any director or officer of the Company. The Company is not a party to, or subject to the provisions of, any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by the Company currently pending or that the Company intends to initiate.  The term "to the Company's knowledge" or "to the knowledge of the Company" (and any similar expression) means any matters actually known by Dr. Ken Shubin Stein, Dr. Tina Youngblood, Nazy Weeks or Brian Feldman.

4

2.7     No Conflicts.  The execution, delivery and performance of and compliance with this Agreement and the Related Documents, and the issuance and sale of the Shares and the Conversion Shares pursuant hereto, will not, with or without the passage of time or giving of notice, (a) conflict with, or result in any violation of or default or loss of any benefit under, any provision of the Bye-laws or other organizational documents of the Company, (b) conflict with, or result in any violation of or default or loss of any material benefit under, any material permit, concession, grant, franchise, law, rule or regulation, or any judgment, decree or order of any court or other governmental agency or instrumentality to which the Company is a party or to which the Company or any of its property is subject, or (c) conflict with, or result in a breach or violation of or default or loss of any benefit under, or accelerate the performance required by, the terms of any material agreement, contract, indenture or other instrument to which the Company is a party or to which any of its property is subject, or constitute a material default or material loss of any right thereunder or an event that, with the lapse of time or notice or both, might result in a default or loss of any right thereunder or the creation of any lien upon any of the assets or properties of the Company or (d) result in the suspension, revocation, impairment, forfeiture or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.

2.8     Consents   No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required in connection with the consummation of the transactions contemplated by this Agreement or the Related Documents, except for (a) with respect to the issuance of the Shares at the Closing, such consents as have been granted or obtained prior to the Closing and (b) compliance with notice filing and other requirements under United States federal securities laws and the applicable securities laws of any state or other jurisdiction, which compliance will have occurred within the appropriate time periods therefor.

2.9     Offering Exemption.  Based in part on the representations of the Investors set forth in Section 3 below, the offer, sale and issuance of the Shares and the Conversion Shares in conformity with the terms of this Agreement are exempt from the registration requirements of the Securities Act and are exempt from the qualification or registration requirements of applicable securities laws of any state or other jurisdiction. Neither the Company nor any agent on its behalf has solicited or will solicit any offers to sell or has offered to sell or will offer to sell all or any part of the Shares to any person or entity so as to bring the sale of such Shares by the Company within the registration provisions of the Securities Act or the securities laws of any state or other jurisdiction.

2.10    Bermuda Exempted Company.  The Company is an "exempted company" under Bermuda law and has not conducted its business in a manner that is prohibited for "exempted companies" under Bermuda law.

2.11    Brokers or Finders.  The Company has not incurred or agreed to incur, directly or indirectly, any liability for brokerage or finders' fees, agents' commissions or other similar charges in connection with this Agreement, the Related Documents or any of the transactions contemplated hereby or thereby, other than fees payable to Dowling Hales.

2.12    Compliance with Law.  The Company (a) is in compliance in all material respects with all statutes or laws and any judgments, orders, decrees, rules or regulations of any court or governmental authority to which the Company or any of its property is subject

5

("*Applicable Laws*") and (b) has not received in writing any outstanding notice that it is not in compliance with, nor, to the knowledge of the Company, is the Company or any of its subsidiaries being threatened with or under investigation with respect to any failure to comply with, any Applicable Law.

2.13    Blocked Persons.   The Company has not been designated by the United States government as a person or entity of the types identified on the United States Treasury Department's list of "Specially Designated Nationals and Blocked Persons" and the Company is not providing financial or material support to any such Persons.

3.    Representations, Warranties and Covenants of the Investors.

As a material inducement to the Company to enter into and perform its obligations under this Agreement, each Investor, severally and not jointly, represents and warrants to the Company as of each Closing as follows:

3.1    Authorization; Enforceability.  The Investor has all requisite power and authority to execute, deliver and perform this Agreement and the Related Documents to which it is a party. All action on the part of the Investor and, as applicable, its directors, officers, members, partners and shareholders, necessary for the authorization, execution, delivery and performance of all obligations of the Investor under this Agreement and the Related Documents to which it is a party has been taken. Each of this Agreement and the Related Documents to which it is a party constitutes the valid and legally binding obligation of the Investor, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally or by equitable principles, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies and (iii) to the extent that the enforceability of indemnification provisions may be limited by applicable laws.

3.2    Investment Intent.  The Shares and the Conversion Shares will be acquired by the Investor for its own account for investment purposes and not with a view to, or for sale in connection with, any distribution or granting of a participation right therein, in whole or in part, in violation of the Securities Act or the securities laws of any jurisdiction applicable to such Investor.

3.3    Accredited Investor.  The Investor is an "accredited investor" within the meaning of Rule 501(a) promulgated under the Securities Act.

3.4    Restricted Securities.  The Investor acknowledges and agrees that the Shares and the Conversion Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. The Investor has been advised or is aware of the provisions of Rule 144 promulgated under the Securities Act as in effect from time to time, which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions. The Investor understands that no public market now exists for any securities issued by the Company and that a public market may never exist for the Shares or the Conversion Shares.

3.5    Investor Awareness.  The Investor is aware, understands and acknowledges that (a) such Investor's investment in the Shares involves a substantial degree of risk of loss of the entire investment and there is no assurance of any income from such investment, (b) an investment in the Shares may potentially be subject to special tax rules under the United States

6

Internal Revenue Code of 1986, as amended (the "*Code*") (that may impose certain additional tax risks and costs), including, without limitation, the rules applicable to (i) controlled foreign corporations as provided in Code sections 951 through 964 and 1248, (ii) passive foreign investment companies as provided in Code sections 1291 through 1298 and (iii) the Foreign Account Tax Compliance Act, (c) as non-U.S. companies, the Company and its subsidiaries could potentially be characterized as engaged in a U.S. trade or business and subject to U.S. federal income tax and the additional branch profits tax, (d) there can be no assurances that the U.S. federal tax consequences of an investment in the Shares to an Investor or its affiliates or the U.S. federal tax treatment to the Company or its subsidiaries will be favorable, or that such consequences will be as described in communications with the Investor, (e) any non-U.S. or U.S., federal, state and/or local income tax benefits that may be available to such Investor may be lost through the adoption of new laws or regulations or changes to existing laws and regulations, (f) because there are substantial restrictions on the transferability of the Shares, it may not be possible for such Investor to sell, transfer, assign, pledge, hypothecate or otherwise liquidate the Shares, (g) no Bermuda or United States federal or state or any other regulatory agency has passed upon the accuracy, validity or completeness of this Agreement or the Bye-laws, or made any finding or determination as to the fairness of an investment in the Shares, and (h) generally, as provided in the Bye-laws and the Shareholders Agreement, an Investor shall hold the Shares subject to, and shall have the voting rights as specified in, the Bye-laws and the Shareholders Agreement as in effect from time to time. The Investor understands that no public market now exists for the Shares or the Conversion Shares and that a public market for such securities may never exist.

3.6     Experience; Access to Information.  The Investor is experienced in evaluating and investing in private placement transactions of securities of companies of a similar size and nature and acknowledges that such Investor can bear the economic risk of such Investor's investment, and has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of the investment in the Shares and is making an independent decision to invest in the Shares based, among other things, upon such Investor's independent knowledge and/or investigation of the potential tax risk, tax costs and other risks associated with an investment in the Shares. The Investor has received all information that such Investor considers necessary or appropriate in determining whether to purchase the Shares. The Investor has had an opportunity to discuss the Company's business with management and to ask questions of the officers of the Company and its subsidiaries, which questions were answered to its satisfaction.

3.7     No Voting Arrangements.  The Investor has not entered into an agreement of any kind whatsoever (other than the Shareholders Agreement) regarding the voting of the Shares or the Conversion Shares.

3.8     Brokers or Finders.  The Investor has not agreed to incur, directly or indirectly, any liability for brokerage or finders' fees, agents' commissions or other similar charges in connection with this Agreement and the Related Documents or any of the transactions contemplated hereby or thereby.

3.9     Investor Location.  If the Investor is an individual, the Investor resides in the country and state or province identified in the address of the Investor set forth on Schedule A; if the Investor is a partnership, corporation, limited liability company or other entity, the office or

7

offices of the Investor in which its principal place of business is located is at the address of the Investor set forth on Schedule A.

3.10    Representation by Non-U.S. Investors.  If the Investor is not a U.S. Person, such Investor hereby represents that such Investor is satisfied as to the full observance of the laws of such Investor's jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (a) the legal requirements with such Investor's jurisdiction for the purchase of the Shares, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained and (d) the income tax and other tax consequences, if any, which may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares and receipt of Conversion Shares upon conversion of the Shares. Such Investor's subscription and payment for, and such Investor's continued ownership of, the Shares will not violate any applicable securities laws or other laws of such Investor's jurisdiction.

3.11    Blocked Persons.  The Investor has not been designated by the United States government as a person or entity of the types identified on the United States Treasury Department's list of "Specially Designated Nationals and Blocked Persons" and such Investor is not affiliated in any way with, or providing financial or material support to, any such Persons.

4.    Conditions to the Investors' Obligations at Each Closing.

The obligation of each Investor under this Agreement to purchase and pay for the Shares being purchased by it at each Closing is subject to the fulfillment or waiver (the waiver of which shall not be effective against any Investor that does not expressly consent thereto), at or prior to the Closing, of the following conditions and each of the parties hereto hereby agrees that the delivery of the purchase price for the Shares to be purchased by any Investor hereunder shall not constitute a waiver by such Investor of any of the conditions set forth in this Section 4:

4.1    Representations and Warranties True.  The representations and warranties of the Company contained in Section 2 shall be true, correct and complete on and as of the Initial Closing with the same force and effect as if they had been made at such time.

4.2    Performance.  The Company shall have performed and complied with all other conditions, covenants and agreements contained in this Agreement required to be performed or complied with by it on or before the Closing.

4.3    Consents and Approvals.  Any consent required for the consummation of the transactions contemplated by this Agreement and the Related Documents shall have been obtained. All permits, approvals, filings and consents required to be obtained or made, and all waiting periods required to expire, prior to the consummation of the transactions contemplated by this Agreement and the Related Documents under United States federal laws, the laws of Bermuda and the laws of any other applicable state or foreign country having jurisdiction over the transactions contemplated by this Agreement and the Related Documents shall have been obtained, made or expired, as the case may be, and all such waiting periods shall have lapsed, and all such permits, approvals, filings and consents shall be in full force and effect.

4.4    Related Documents.  The Company shall have executed and delivered each of the Related Documents to the Investors, each of which shall be in full force and effect.

8

4.5     Compliance Certificates.  The Company shall have delivered to the Investors a certificate, dated as of the Closing, of an officer certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

4.6     Supporting Documents.  The Company shall have delivered to the Investors copies of the following documents: (a) a certificate of the Secretary or an Assistant Secretary of the Company dated the date of the Closing and certifying (i) that attached thereto is a true and complete copy of the Bye-laws of the Company as amended and in effect on the date of such certification and (ii) that attached thereto is a true and complete copy of all resolutions adopted authorizing the execution, delivery and performance of this Agreement and the Related Documents, and the issuance, sale and delivery of the Class A Preference Shares, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated by this Agreement and the Related Documents; and (b) such additional supporting documents and other information with respect to the operations and affairs of the Company as the Investors reasonably may request.

4.7     Share Certificates.   The Company shall have delivered to each Investor certificates evidencing the Shares issued and sold to the Investors at the Closing.

4.8     Minimum Investment.  Each Investor shall have purchased and paid for the Shares to be purchased by such Investor at the Closing in accordance with this Agreement.

4.9     Blue Sky Approvals.  The Company shall have taken all actions necessary for the exemptions from the state securities laws of the jurisdictions in which the Class A Preference Shares are being sold on or before the Closing, or at such time thereafter as may be required or allowed by Applicable Law.

5.     Conditions to the Company's Obligations at Each Closing.

The obligations of the Company under this Agreement are subject to the satisfaction (or waiver in writing by the Company) on or before each Closing of each of the following conditions:

5.1     Representations and Warranties True.  The representations and warranties of the Investors contained in Section 3 shall be true, correct and complete on and as of the Closing with the same force and effect as if they had been made at such time.

5.2     Performance.  The Investors shall have performed and complied with all other conditions, covenants and agreements contained in this Agreement required to be performed or complied with by them on or before the Closing.

5.3     Related Documents.  The Investors shall have executed and delivered to the Company each of the Related Documents to which they are a party.

5.4     Qualifications.   All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States, Bermuda (including, without limitation, the Bermuda Monetary Authority) or of any state or other jurisdiction that are required in connection with the lawful issuance and sale of the Shares and the Conversion Shares to the Investors pursuant to this Agreement shall have been duly obtained and shall be effective on and as of the Closing.

9

6.    Indemnification.

  6.1 Indemnification by the Company.  The Company shall indemnify, defend and hold harmless each Investor and their respective officers, directors, successors and assigns (collectively, the "***Investor Indemnified Parties***"), from and against, and will pay to any Investor Indemnified Party the amount of, any and all claims, demands, proceedings, losses, damages (but specifically excluding indirect, special, incidental, consequential and punitive damages except to the extent arising out of a third party claim), penalties, liabilities, obligations, settlement payments, costs and expenses of every kind whatsoever (including without limitation, costs of investigating, preparing or defending any such claim or proceeding and reasonable legal fees and disbursements), as and when incurred by such Investor Indemnified Party and whether or not involving a third party claim (collectively, "***Losses***"), incurred or suffered by any of the Investor Indemnified Parties, arising out of or relating to (a) any inaccuracy of any representation or warranty of the Company contained in this Agreement or in any Related Document (including all schedules, exhibits and annexes hereto and thereto) or in any certificate or document delivered by the Company in connection therewith and (b) any breach of any covenant or agreement of the Company contained in this Agreement or any Related Document.

  6.2 Indemnification by Investor.  Each Investor, severally and not jointly, shall indemnify, defend and hold harmless the Company and its Subsidiaries and affiliates from and against any and all Losses incurred or suffered by the Company, any Subsidiary or affiliate thereof arising by reason of or resulting from (a) any inaccuracy of any representation or warranty of such Investor contained in this Agreement or in any Related Document (including all schedules, exhibits and annexes hereto and thereto) or in any certificate or document delivered in connection therewith and (b) any breach of any covenant or agreement of such Investor contained in this Agreement or any Related Document.

7.    General.

  7.1 Confidentiality.

   (a) Each Investor and the Company agrees that (i) this Agreement (including all schedules and exhibits to this Agreement), the Related Documents and the terms and conditions hereof and thereof, (ii) any documentation or information relating to the transactions contemplated by this Agreement and the Related Documents and (iii) any other confidential or non-public information relating to the Company, any Subsidiary of the Company, any affiliate of the Company or any other Investor or its business disclosed to such Investor in whether or not in writing (collectively, the "***Confidential Information***"), is confidential and shall not be disclosed to any individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization or other entity and any government, governmental department or agency or political subdivision thereof ("***Person***") or used for any purpose other than in connection with the transactions contemplated by this Agreement and the Related Documents. Notwithstanding the foregoing, nothing herein will prevent the disclosure of Confidential Information (A) of the Company or a Subsidiary of the Company by an Investor to other Investors, (B) as required by applicable law or pursuant to the request of any court, arbitrator or governmental or self-regulatory body, agency or official (subject to delivery of prior notice to the Company and the opportunity to seek a protective order), (C) to the extent that such information becomes publicly available other than by reason of violation of this paragraph, (D) of the Company or a Subsidiary of the Company by an Investor to such

10

Investor's partners, members, directors, officers, employees, affiliates and advisers ("*Representatives*") who (1) need to know such information in connection with the transactions contemplated by this Agreement and the Related Documents or (2) require such information for purposes of internal compliance or evaluating an investment in the Company or such Investor and, in each case, who have been informed by such Investor of the confidential nature of such information and directed to treat such information confidentially or (E) of the Company or a Subsidiary of the Company with the prior written consent of the Company.

(b)     Each party agrees that a breach by it of the terms of this Section 7.1 could result in irreparable harm to the other parties, for which money damages would be inadequate, and that therefore any other party shall be entitled to seek the remedy of specific performance and other equitable relief in connection with any such breach or threatened breach.

(c)     Notwithstanding anything to the contrary set forth in this Section 7.1, any Investor and its Representatives or other agents may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and the Related Documents and all materials of any kind (including, without limitation, opinions and other tax analyses) that are provided to any Investor or the Company relating to such tax treatment and tax structure.

(d)     The foregoing provisions of this Section 7.1 shall terminate on the second anniversary of the earlier of (i) the closing of an initial public offering of the Company's equity securities and (ii) the consummation of a Sale Transaction (as defined in the Bye-Laws).

7.2     Press Release. Except with the prior written consent of the Required Holders (as defined in the Shareholders Agreement) or as required by applicable law, the Investors will not, and each will direct its employees, agents and representatives not to, issue any written press release with respect to the transactions contemplated by this Agreement or the Related Documents.

7.3     Survival. All representations and warranties made by any party in this Agreement and the Related Documents or pursuant hereto or thereto shall survive any investigation made at any time by or on behalf of any other party and shall survive the Closings. The covenants and agreements set forth in this Agreement and the Related Documents shall survive the Closings and shall continue until all obligations set forth therein shall have been performed or satisfied or they shall have terminated in accordance with their terms.

7.4     Exculpation Among Investors. Each Investor acknowledges that it is not relying upon any other Investor in making its investment decision to invest in the Company. Each Investor agrees that no other Investor nor the respective controlling persons, officers, directors, partners, agents or employees of any other Investor shall be liable to such Investor for any losses incurred by such Investor in connection with its investment in the Company.

7.5     Use of Proceeds. The Company shall use the cash proceeds from the sale of the Shares to pay all transaction expenses in connection with the issuance of the Shares, to finance the purchase of the collection of affiliated companies operating as an independent provider of finance and insurance products and services to franchised automobile dealers primarily located across the south-western and mid-western United States and for general working capital purposes.

7.6     Expenses. Each party shall bear its own expenses incurred with respect to this Agreement, the Related Documents and the transactions contemplated hereby and thereby.

7.7     Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties (including transferees of any Shares or Conversion Shares). Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by the Company. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Investor other than by any Investor to a transferee of such Investor's Shares in any transaction permitted under the terms of the Shareholders Agreement. Any attempted assignment made in contravention of this Agreement shall be null and void and of no force or effect.

7.8     Amendment. Except as otherwise expressly set forth in this Agreement, any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Required Holders (as defined in the Shareholders Agreement); provided, that no amendment which adversely affects the rights or obligations of any Investor under this Agreement or any Related Document in a manner disproportionate to other holders of the same class or series of shares shall be effective without the affirmative vote or written consent of such adversely and disproportionately affected Investor. Any amendment or waiver effected in accordance with this Section 7.8 shall be binding upon each holder of Shares and Conversion Shares and each future holder of all such securities and the Company.

7.9     Injunctive Relief. The Investors and the Company acknowledge and agree that, in view of the uniqueness of the Shares and the Conversion Shares, damages at law would be insufficient for breach by the Company of any of its covenants in this Agreement. Accordingly, the Company agrees that in the event of breach or threatened breach by the Company of any provisions of this Agreement, the Investors shall be entitled to equitable relief in the form of an order to specifically perform or an injunction to prevent irreparable injury, without being required to provide security or post bond. Nothing herein shall be construed as prohibiting any party hereto from, pursuing solely or in addition any other remedies, including damages, for breach or threatened breach of this Agreement.

7.10    Taxes.

(a)     The Company shall provide an Investor, upon timely request, (i) sufficient information for a U.S. Person to make a timely qualified electing fund election as set forth in section 1293 of the Code (a "*QEF Election*") and (ii) not later than the first day of the fifth month of each tax year a PFIC Annual Information Statement and any other information or representations that any U.S. Person that directly or indirectly holds an interest in such Investor requires to make or maintain a timely QEF Election for the previous tax year.

(b)     The Company will provide prompt written notice to each Investor if at any time the Company becomes aware that it or any Subsidiary has become or ceases to be a "controlled foreign corporation" ("*CFC*") within the meaning of section 957 of the Code. The Company believes that it should be characterized as a CFC at the time of the Closing and each Investor should consider this Agreement as notice required by the previous sentence. For any

12

year with respect to which the Company is treated as a CFC, at the request of any Investor, or if the Company shall have determined, in its good faith discretion, that any U.S. Person that directly or indirectly holds shares in the Company (within the meaning of section 958(a) of the Code) is a "United States Shareholder" as defined by section 951(b) of the Code, the Company shall furnish to the applicable Investor, upon its request, (i) all information necessary to satisfy the U.S. income tax return filing requirements of such Investor (and each "United States Shareholder" of the Company as defined by section 951(b) of the Code that owns a direct or indirect interest (a "**U.S. Shareholder**") in such Investor), including without limitation the information necessary to complete Internal Revenue Service Form 5471, arising from its investment in the Company and relating to the Company's classification as a CFC and (ii) quarterly estimates of the Company's and each Subsidiary's "subpart F income", as such term is defined in section 952 of the Code. Upon written request of an Investor from time to time, subject to obtaining the consent of its shareholders to release such information, the Company will promptly provide in writing a report (if one has been prepared) from an internationally recognized accounting firm analyzing the direct and indirect ownership of the Company for the purposes of a CFC/United States Shareholder analysis.

(c)     The Company has retained an internationally recognized accounting firm (the "**Designated Accounting Firm**") to periodically analyze the direct and indirect ownership of the Company for purposes of a CFC/United States Shareholder analysis (a "**Voting Analysis**") at such time as a "voting cut back" provision, limiting the voting rights of U.S. persons that directly or indirectly hold Company shares to avoid any such person being characterized as a United States Shareholder of the Company, has been included in the Company's Bye-Laws.   Each Investor will exercise due care and conduct a reasonable investigation in completing a "voting right questionnaire" at the request of the Company in connection with a Voting Analysis, will deliver the completed voting rights questionnaire within a reasonable period of time to the Designated Accounting Firm and will provide the Designated Accounting Firm with any additional information reasonably requested for purposes of completing the Voting Analysis. The Company intends to cause the Designated Accounting Firm to keep confidential any information provided by the Investor pursuant to this Section 7.10(c), except to the extent required to be disclosed by applicable laws or regulations.

(d)     The Company shall from time to time upon written request of any Investor use commercially reasonable efforts to determine whether Investors or their direct or indirect holders will be required to include in income related party insurance income ("**RPII**"), as such term is defined in section 953(c) of the Code. The Company shall promptly notify each Investor in writing if it determines that Investors or their direct or indirect holders will be required to include RPII in income. Additionally, if the Company determines that Investors or their direct or indirect holders will be required to include in income RPII for any taxable year, the Company shall provide each Investor with all information necessary to satisfy the U.S. income tax filing requirements of such Person, including without limitation the information necessary to complete Internal Revenue Service Form 5471, arising from its investment in the Company and relating to the requirement to include in income RPII as a result of such investment.

7.11    <u>Remedies Cumulative</u>.   No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

13

7.12   No Waiver.  No waiver of any provision or consent to any action shall constitute a waiver of any other provision or consent to any other action, whether or not similar. No waiver or consent shall constitute a continuing waiver or consent or commit a party to provide a waiver in the future except to the extent specifically set forth in writing.

7.13   Jury Trial Waiver.  To the fullest extent permitted by law, and as separately bargained-for-consideration, each party hereby waives any right to trial by jury in any action, suit, proceeding or counterclaim of any kind arising out of or relating to this Agreement.

7.14   **GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAWS.**

7.15   Notices.  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized express courier, specifying next day (or earliest possible) delivery, with written verification of receipt. All communications shall be sent to the Company at the address as set forth on the signature page hereof and to an Investor at the Investor's address set forth on Schedule A attached hereto or at such other address as the Company or an Investor may designate by ten (10) days advance written notice to the other parties hereto.

7.16   Severability.  If any term or provision of this Agreement is determined to be illegal, unenforceable or invalid in whole or in part for any reason, such illegal, unenforceable or invalid provisions or part thereof shall be stricken from this Agreement, and such provision shall not affect the legality, enforceability or validity of the remainder of this Agreement. If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this Section 7.16, then such stricken provision shall be replaced, to extent possible, with a legal, enforceable and valid provision that is as similar in tenor to the stricken provision as is legally possible.

7.17   Entire Agreement.  This Agreement and the documents, schedules and exhibits referred to herein or executed and delivered in connection herewith constitute the entire agreement among the parties and supersede all prior communications, representations, understandings and agreements of the parties with respect to the subject matter hereof and thereof. No party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein or therein. All schedules and exhibits hereto are hereby incorporated herein by reference. Nothing in this Agreement, express or implied, is intended to confer upon any third party any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.18   Section Headings.  The section headings are for the convenience of the parties and in no way alter, modify, amend, limit or restrict the contractual obligations of the parties.

7.19   General Interpretation.  The terms of this Agreement have been negotiated by the parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Agreement shall be construed

14

without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under this Agreement. No rule of strict construction will be applied against any Person. For all purposes of this Agreement, unless otherwise expressly provided or unless the context otherwise requires:

(a) any pronouns used in this Agreement shall include the corresponding masculine, feminine or neutral forms, and the singular form of nouns and pronouns shall include the plural, and vice versa;

(b) the words "herein", "hereto" and "hereby", and other words of similar import, refer to this Agreement as a whole and not to any particular Section or other subdivision of this Agreement;

(c) references to Sections, clauses, other subdivisions and exhibits are references to Sections, clauses, other subdivisions and exhibits of this Agreement;

(d) any reference herein to a statute, rule or regulation of any governmental entity (or any provision thereof) shall include such statute, rule or regulation (or provision thereof), including any successor thereto, as it may be amended from time to time; and

(e) any reference to the "Company" shall mean the Company, acting through its authorized officers or the Board and shall not, unless otherwise expressly indicated or as required by Applicable Laws, mean the Shareholders or Members or imply any action or approval thereby.

7.20 Counterparts; Facsimile Signatures. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same document. This Agreement may be executed by facsimile or .pdf signatures.

*[Signature Pages Follow]*

15

IN WITNESS WHEREOF, the parties have executed this Class A Preference Share Subscription Agreement as of the date first above written.

**COMPANY:**

**SPENCER CAPITAL HOLDINGS LTD**

By:_____

    Name:  Ken Shubin Stein
    Title:  Director

    Address:  c/o Attride-Stirling & Woloniecki
             Crawford House
             50 Cedar Avenue
             Hamilton HM11
             Bermuda

16

**INVESTOR:**

NEW CASTLE REINSURANCE COMPANY LTD

By: _____

Name: ADRIAN KIMBERLEY

Title: DIRECTOR

17

[To be Completed at Closing]

## SCHEDULE A

| Name and Address of Investor | Shares | Purchase Price |
| --- | --- | --- |
| NEW CASTLE REINSURANCE COMPANY LTD WINDSOR PLACE 3rd FLOOR 18 QUEEN STREET HAMILTON, HM JX BERMUDA | 250,000 | $5,000,000 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| TOTAL: |  | $5,000,000 |

**SCHEDULE B**

## JOINDER TO SHAREHOLDERS' AGEEMENT
## AND REGISTRATION RIGHTS AGREEMENT
### OF
## SPENCER CAPITAL HOLDINGS LTD.

Dated: March ___, 2015

Reference is made to that certain Shareholders' Agreement, dated as of October 21, 2011 (as amended) (the "**Shareholders' Agreement**"), and the Registration Rights Agreement, dated as of October 21, 2011 (as amended) (the "Registration Rights agreement") between (amongst others) Spencer Capital Holdings Ltd., an exempted company incorporated in Bermuda (the "**Company**"), and the shareholders of the Company.

**WHEREAS**, capitalized terms used in this Joinder shall have the meanings given to them in the Shareholders' Agreement unless otherwise defined herein; and

**WHEREAS**, pursuant to Sections 2.2 and 12.2 of the Shareholders' Agreement a proposed transferee of Company Securities is required to become a party to, and to execute and deliver to the Company a joinder to, the Shareholders' Agreement and the Registration Rights Agreement (together the "**Investment Documents**").

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements set forth herein and for other good and valuable consideration, the receipt of and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. **Joinder.** In accordance with and pursuant to the terms of the Investment Documents, effective as of the date hereof, by executing and delivering this Joinder, the New Investor agrees to join in, become a party to, be bound by, and comply with the provisions of:

    (i)     the Shareholders' Agreement as an Investor, subject to all of the obligations and entitled to all of the rights and benefits of an Investor set forth therein;

    (ii)    the Registration Rights Agreement as a Shareholder, subject to all of the obligations and entitled to all of the rights and benefits of a Shareholder set forth therein;

1

in each case, in the same manner as if the New Investor were an original signatory to the Investment Documents; (b) makes all of the representations and warranties of the Shareholders set forth in the Shareholders Agreement as of the date hereof; and (c) acknowledges that all Class A Preference Shares, Common Shares and other equity securities of the Company now or hereafter held by them shall be subject to all applicable restrictions on transfer, voting agreements and other provisions of the Investment Documents.

2. **Effect of Joinder.**  Except as expressly set forth herein, this Joinder shall not alter, modify, amend or in any way affect any of the terms, conditions, covenants, obligations or agreements contained in the Investment Documents, all of which are ratified and affirmed in all respects and shall continue in full force and effect.

3. **Further Assurance**. Each party hereto shall co-operate and shall take such further action and shall execute and deliver such other and further documents as may be reasonably requested by any other party in order to fully carry out the provisions and purposes of this Joinder.

4. **Governing Law.**  This Joinder shall be governed by, and construed in accordance with the laws of the State of New York, without give effect to the principles of conflict of laws.

5. **Counterparts.** This Joinder may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same document.   This Joinder may be executed by facsimile or .pdf signatures.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Company and the New Investor have caused this Joinder to be executed as of the date set forth above.

**COMPANY**

**SPENCER CAPITAL HOLDINGS LTD.**

By:_____

Kenneth Shubin Stein
Chairman


**NEW INVESTOR**

NEW CASTLE REINSURANCE COMPANY LTD

By:_____

Name: ADRIAN KIMBERLEY

Title: DIRECTOR


| Name and Address of New Investor | No. and Class of Company Securities acquired by New Investor |
|---|---|
| NEW CASTLE REINSURANCE COMPANY LTD WINDSOR PLACE 3rd FLOOR 18 QUEEN STREET HAMILTON HM JX BERMUDA | 250,000   Class A Preference Shares |

3

## EXHIBIT A

### Second Amended and Restated Bye-Laws of the Company

*See attached.*