UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAVELLO BAY REINSURANCE LIMITED,

                    Plaintiff,

          v.

KENNETH SHUBIN STEIN; SPENCER
CAPITAL LIMITED, *formerly known as
Spencer Capital Holdings Ltd.*; and SPENCER
CAPITAL HOLDINGS LTD.,

                    Defendants.

No. 18-CV-11362 (KMK)

OPINION & ORDER

Appearances:

Anthony B. Ullman, Esq.
Timothy Jon Straub, Esq.
Dentons US LLP
New York, NY
*Counsels for Plaintiff*

Robert A. O'Hare, Jr., Esq.
O'Haire Parnagian LLP
New York, NY
*Counsel for Defendant Kenneth Shubin Stein*

Lea Haber Kuck, Esq.
Colm P. McInerney, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
New York, NY
*Counsel for Defendants Spencer Capital Limited and Spencer Capital Holdings Ltd.*

KENNETH M. KARAS, United States District Judge:

          Plaintiff Cavello Bay Reinsurance Limited  ("Plaintiff") brings this Action against

Kenneth Shubin Stein ("Stein"), Spencer Capital Limited, and Spencer Capital Holdings Ltd.

(collectively, "Spencer," and together with Stein, "Defendants"), alleging that Defendants

engaged in fraud while soliciting Plaintiff's purchase of stock in Spencer, in violation of federal

securities laws § 29(b) of the Securities Exchange Act (the "Act"), 15 U.S.C. § 78cc(b); § 10(b)

of the Act, 15 U.S.C. § 78j(b); § 20(a) of the Act, 15 U.S.C. § 78t; and Rule 10b-5 of the Code of

Federal Regulations promulgated by the Securities and Exchange Commission ("SEC"), 17

C.F.R. § 240.10b-5.  (*See* Am. Compl. ¶¶ 43–67 (Dkt. No. 28).)  Before the Court are Stein's and

Spencer's Motions To Dismiss the Amended Complaint (individually, the "Stein Motion" and the

"Spencer Motion," and collectively, the "Motions") pursuant to Rules 9(b) and 12(b)(6) of the

Federal Rules of Civil Procedure.  (*See* Not. of Spencer Mot.; Not. of Stein Mot. (Dkt. Nos. 29,

32).)  For the reasons stated below, both Motions are granted.

## I.  Background

### A.  Factual History

The following facts are taken from the Amended Complaint and assumed as true for the

purposes of deciding the instant Motions.

#### 1.  Relevant Parties and Entities

Plaintiff is a company organized under the laws of Bermuda with its principal place of

business in Bermuda.  (Am. Compl. ¶ 5.)  Plaintiff is a subsidiary of Enstar Group Limited

("Enstar"), a global insurance group with its principal offices in Bermuda.  (*Id*.)  Enstar "acts for

and on behalf of all entities" owned by it, which includes Plaintiff.  (*Id*.)

Defendant Spencer Capital Limited is a company organized under Bermudan law and

alleged to have its principal place of business in New York.  (*Id*. ¶ 6.)  It is alleged to be a private

holding company that owns primarily insurance-related assets.  (*Id*. ¶ 11.)  According to Plaintiff,

Defendant Spencer Capital Limited holds and administers an investment portfolio, which

constitutes a "substantial portion" of its assets and contributes "significantly" to the overall

revenue earned by the entity.  (*Id*.)  Spencer Capital Management LLC ("Spencer Management")

is alleged to be the entity that actually managed the investment accounts owned by Defendant

Spencer Capital Limited, pursuant to an Investment Management Agreement (the "IMA"). (*Id*. ¶¶ 2, 11.) Spencer Management is allegedly organized under the laws of Delaware and has its principal place of business in New York. (*Id*. ¶ 2.)

Stein is alleged to be the CEO and Chairman of both Defendant Spencer Capital Limited and Spencer Management and a resident of New York State. (*Id*. ¶¶ 2, 6, 8.) Plaintiff also alleges that, due to corporate restructuring that occurred in November 2016, Defendant Spencer Capital Limited became a wholly-owned subsidiary of a related entity that was renamed Defendant Spencer Capital Holdings, Ltd., which is also alleged to be organized under Bermudan law, with its principal place of business in New York. (*Id*. ¶¶ 6–7.) Plaintiff believes that, as a result of the securities transaction it engaged in (summarized below), Plaintiff became a shareholder of Defendant Spencer Capital Holdings, Ltd. (*Id*. ¶ 6.)[1]

### 2. The Alleged Misrepresentation and Securities Transaction

Plaintiff alleges that, in 2015, Spencer sought to raise $75 million in capital through the issuance and sale of 3.75 million Class A shares (the "Offering"). (*Id*. ¶ 12.) The Offering was publicized to potential investors as a way to fund the purchase of a target company engaged in the distribution of financial and insurance products and other general corporate purposes, with a $25 million amount "to be 'rolled' over." (*Id*.) Spencer made written and/or oral presentations in February 2015 to prospective purchasers. (*Id*. ¶ 13.)

---

[1] Because both Defendants Spencer Capital Limited and Spencer Capital Holdings, Ltd., filed their Motion together and because parsing between the two corporate entities is irrelevant to resolving the instant Motions, the Court refers to both of them collectively as "Spencer" throughout this Opinion & Order.

A written presentation entitled "Spencer Capital Holdings Primer," dated February 2015 (the "2015 Primer"), was sent to Enstar in February 2015. (*Id*. ¶ 14.)[2] In it, Spencer represented that it paid an investment management fee to Spencer Management that was comprised of a fixed fee of $1 million per year and a variable incentive fee of "25% of profits above an 8% growth in book value per share." (*Id*.; Am. Compl. Ex. A ("2015 Primer") 14 (Dkt. No. 28-1).) According to Plaintiff, Stein sent two versions of the 2015 Primer via e-mail to Plaintiff "while he was physically located, upon information and belief, in New York." (Am. Compl. ¶ 14.)

On February 25, 2015, Stein pitched the Offering to Enstar, in Bermuda, over the phone. (*Id*. ¶ 14.) Plaintiff, again, upon information and belief, alleges that Stein was located in New York during this phone call. (*Id*.) Plaintiff states that this "belief" is premised on the fact that Stein was and is a resident of New York and works in New York. (*Id*.) Plaintiff alleges that because Stein "controlled" Spencer, Stein must have "at minimum reviewed and approved all content in the 2015 Primer." (*Id*. ¶ 15.) Plaintiff bases this assertion on Enstar's course of dealing with Spencer, during which it appeared that Stein "was the dominant and controlling figure" and was "intimately involved in all of [Spencer's] material activities including funds raising." (*Id*.)

Plaintiff alleges that, based on the written and oral communications made in February, Enstar understood that the incentive fee paid by Spencer to Spencer Management was "tied solely to profits" only after the threshold of 8% growth in book value per share had been met.

---

[2] The 2015 Primer is attached as Exhibit A to the Amended Complaint, and the Court will use it as needed in resolving the instant Motions. *See 120 Greenwich Dev. Assocs., L.L.C. v. Admiral Indem. Co.*, No. 08-CV-6491, 2013 WL 12331487, at *1 n.1 (S.D.N.Y. Sept. 25, 2013) (explaining that a court may consider the pleadings, exhibits to the pleadings, statements or documents incorporated by reference in the pleadings, any matter of which the court may take judicial notice, and documents that are "integral" to the complaint (collecting cases)).

(*Id.* ¶ 16.)  Plaintiff claims that it also received a "Form ADV," a registration form filed by investment advisors with the SEC, that stated that Spencer Management received an incentive fee "expressed as a percentage of profits" and provided, as an example, the existence of an agreement with non-party Spencer Capital Fund LLC which called for an incentive fee calculated as "25% of any net profits above 60%."  (*Id.* ¶ 16 (alteration omitted).)

Plaintiff alleges Enstar properly understood the term "profits" to mean "financial gain due to operational activities and/or investments" and did not or should not have included "an increase or enhancement in value due to capital raised through the issuance of securities," i.e., through a sale of stocks, like the Offering.  (*Id.* ¶ 17.)  Plaintiff claims that it would be an impermissible stretch of common business knowledge and parlance to assume that any portion of the incentive fee that Spencer paid to Spencer Management would be calculated based on the capital raised through the Offering or any other issuance of securities.  (*See id.*)  Spencer and Stein allegedly should have known that Enstar would not have adopted this interpretation of the IMA and the incentive fee structure based on the representation made in the 2015 Primer.  (*See id.*)

On March 12, 2015, Plaintiff purchased 250,000 shares of Spencer for $5 million, pursuant to a Class A Preference Share Subscription Agreement (the "2015 Subscription Agreement").  (*Id.* ¶ 19; *see also id.* Ex. B ("2015 Subscription Agreement") (Dkt. No. 28-2).)[3] Enstar decided to purchase the shares on behalf of Plaintiff.  (Am. Compl. ¶ 19.)  Plaintiff signed the 2015 Subscription Agreement and emailed it to Stein and a New York financial advisory firm involved in the transaction.  (*Id.* ¶ 20.)  Later that same day, Stein countersigned the 2015

_____

[3] Like the 2015 Primer, the Court will consider the 2015 Subscription Agreement as needed when resolving the instant Motions.  (*See supra* note 2.)

Subscription Agreement, on behalf of Spencer, and the fully executed version was emailed back to Plaintiff by the New York financial advisory firm. (*Id.*)

However, in late November 2015, Plaintiff allegedly came to learn that the language in the IMA actually allowed Spencer Management to calculate its incentive fee based on capital raised through the Offering and not exclusively through the normal course of operations. (*Id.* ¶ 22.) Specifically, the IMA reads that Spencer will pay a "performance fee . . . equal to 25% of the amount of the Net Book Value per share . . . [that] appreciates in excess of 8% per annum compounded quarterly on the last day of each Performance Period multiplied by the average number of shares outstanding during the Performance Period, provided that any Class A Preference Shares outstanding shall be included in any such calculation on an as converted basis." (*Id.* (quoting the IMA).) The IMA provides that "[t]he appreciation in the Net Book Value per share is the difference between the Net Book Value per share as of the last day of the Performance Period . . . and the High Water Mark," which is the "highest Net Book Value per share for any previous Performance Valuation Date." (*Id.* ¶ 22, n.1.) Therefore, according to Plaintiff, and much to its surprise, Spencer paid Spencer Management performance fees of $4.4 million, "based largely if not exclusively on . . . the proceeds of the Offering, which totaled approximately $60 million." (*Id.* ¶ 22(c).) Plaintiff claims that this was a material inconsistency with what the 2015 Primer represented regarding the incentive fee structure and that Plaintiff was never informed of the possibility that the fee would be calculated based on any capital influx from the Offering. (*See id.* ¶¶ 23–24.)

Plaintiff alleges that it first became aware of the purported fraud in November 2015, when other shareholders informed it that the incentive fees paid to Spencer Management in May and June 2015 had been calculated based on increases in book value attributable "solely" to

funds received through the Offering. (*Id*. ¶ 27.) Settlement talks ensued but failed. (*See id*. ¶¶ 27–28.)

Based on the above, Plaintiff seeks either rescission of the 2015 Subscription Agreement or, in the alternative, compensatory damages. (*See id*. ¶¶ 49, 51, 59.) Plaintiff also seeks to hold Stein jointly and severally liable for any of Spencer's liability through control person liability. (*See id*. ¶ 66.)

B.  Procedural History

Plaintiff filed the original Complaint on December 6, 2018. (*See* Compl. (Dkt. No. 7).) Defendants filed Pre-Motion Letters seeking to file motions to dismiss the Complaint on February 15, 2019. (*See* Dkt. Nos. 22–23.) The Court held a Pre-Motion Conference, where Plaintiff agreed to file an Amended Complaint by May 1, 2019, and the Court adopted a briefing schedule for future motions to dismiss the amended pleading. (*See* Dkt. (minute entry for Apr. 10, 2019).) Plaintiff filed the Amended Complaint. (*See* Am. Compl.)

On June 7, 2019, Defendants filed their respective Motions. (*See* Not. of Spencer Mot.; Not. of Stein Mot.; *see also* Mem. of Law in Supp. of Spencer Mot. ("Spencer Mem."); Decl. of Colm P. McInerney, Esq., in Supp. of Spencer Mot. ("McInerney Decl."); Mem. of Law in Supp. of Stein Mot. ("Stein Mem."); Decl. of Robert A. O'Hare Jr., Esq., in Supp. of Stein Mot. ("O'Hare Decl.") (Dkt. Nos. 30–31, 33–34).) Plaintiff filed its Opposition to each Motion on July 12, 2019. (*See* Pl.'s Mem. of Law in Opp'n to Spencer Mot. ("Pl.'s Spencer Mem."); Pl.'s Mem. of Law in Opp'n to Stein Mot. ("Pl.'s Stein Mem."); Decl. of Timothy Straub, Esq., in Opp'n to Mots. ("Straub Decl.") (Dkt. Nos. 35–37).) Defendants filed Replies on July 26, 2019.

(*See* Reply Mem. of Law in Supp. of Spencer Mot. ("Spencer Reply Mem."); Reply Mem. of Law in Supp. of Stein Mot. ("Stein Reply Mem.") (Dkt. Nos. 38–39).)[4]

## II.  Discussion

### A.  Standard of Review

 "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alterations, and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the

---

[4] On October 10, 2019, counsel for Spencer wrote to inform the Court that Spencer had filed a "winding-up petition" in Bermuda, and joint provisional liquidators were appointed for Spencer on September 27, 2019.  (Dkt. No. 40.)  Counsel informed the Court that although this creates an automatic stay of other proceedings in Bermuda, the stay does not have any extra-territorial effect.  (*See id.*)  On October 17, 2019, Plaintiff's counsel responded and wrote that it understood Bermudan law to create an automatic stay as to all proceedings, including this one.  (*See* Dkt. No. 42.)  However, Plaintiff did not move for a stay and instead noted that it "expect[ed]" Spencer to do so.  (*Id.*)  Counsel for Spencer replied, disagreeing with this interpretation of Bermudan law, explaining that counsel in the *Bermuda* action may be able to request an order for a stay from the *Bermudan court* staying this Action.  (*See* Dkt. No. 44.) However, according to counsel in this Action, the Bermudan joint provisional liquidators had not yet moved for such a stay.  (*See id.*)

Despite the discussion in these letters, no Party has filed any motion to stay, and accordingly, the Court will decide the instant Motion without further delay.

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [its] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alteration and quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

B.  Analysis

1.  Applicable Law

a.  Section 29(b)

Section 29(b) of the Act provides in part that "[e]very contract made in violation of any provision" within the Act "shall be void . . . as regards the rights of any person who . . . shall have made or engaged in the performance of any such contract."  15 U.S.C. § 78cc(b).  The Supreme Court went on to recognize that "[§] 29(b) renders contracts in violation of the . . . Act 'voidable at the option of the innocent party.'"  *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 626 (S.D.N.Y. 1996) (italics omitted) (quoting *Mills v. Elec. Auto-Lite Co*, 396 U.S. 375, 385 (1970)).  Courts in the Second Circuit have held that "a party seeking to void a contract under § 29(b) must show that (1) the contract involved a prohibited transaction, (2) [the party] is in contractual privity with the defendant, and (3) [the party] is in the class of persons the Act was designed to protect."  *NovaFund Advisors, LLC v. Capitala Grp., LLC*, No. 18-CV-1023, 2020 WL 230089, at *13 (D. Conn. Jan. 14, 2020) (quotation marks omitted) (collecting cases); *see also Boguslavsky v. Kaplan*, 159 F.3d 715, 722 (2d Cir. 1998) ("Section 29(b) provides for the rescission of a contract if the contract violates any provision of the Act or its regulations." (citation omitted)).  Here, Plaintiff bases its § 29(b) claim on an underlying purported violation of § 10(b) of the Act and Rule 10b-5.  (*See* Am. Compl.)  "[R]escission is . . . available as a remedy for violations of § 10(b) and the regulations promulgated thereunder."  *Boguslavsky*, 159 F.3d at 721 n.5 (citation omitted); *see also Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (holding that rescission of a stock agreement is an "appropriate remedy" under §§ 10(b) and 17 of the Act).

<u>b. Section 10(b) and Rule 10b-5</u>

Rule 10b-5, a regulation promulgated pursuant to § 10(b), states in relevant part that it is "unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud"; "(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading"; or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  To state a claim for relief under § 10(b) and Rule 10b-5, a plaintiff must adequately allege (1) that the defendants made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied, and (5) that plaintiff's reliance was the proximate cause of his injury.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *see also ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (same).  The requisite state of mind, scienter, requires an "intent to deceive, manipulate or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation and quotation marks omitted).

Moreover, securities fraud claims brought under § 10(b) and Rule 10b-5 are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which provides that "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To state a claim for relief under these authorities, therefore, a plaintiff must at least: "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted).  "[P]rivate securities fraud actions must also meet the [Private Securities Litigation Reform Act's ("PSLRA")] pleading requirements," which requires that the complaint "state with

particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Id.* (citations, footnote, and quotation marks omitted). "Such intent can be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000) (citations and quotation marks omitted). The Supreme Court has instructed that this means a complaint of securities fraud passes muster "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (footnote omitted).

<u>c. Section 20(a)</u>

Plaintiff also invokes § 20(a) of the Act against Stein. (*See* Am. Compl. ¶¶ 60–67.)

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability in the Second Circuit, a plaintiff must show (1) a primary violation by a controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *In re MBIA, Inc., Secs. Litig.*, 700 F. Supp. 2d 566, 597 (S.D.N.Y. 2010) (alteration and quotation marks omitted) (quoting *ATSI*, 493 F.3d at 108).

### 2.  Application

Defendants first argue that the Act does not apply to the transaction at issue because it is a foreign transaction beyond the reach of the United States' federal securities laws.  (*See* Spencer Mem. 8–12; Stein Mem. 10–13.)  Defendants also argue that the facts in the Amended Complaint fail to plausibly allege materiality of the purported misrepresentation, scienter in making the purported misrepresentation, or reasonable reliance on the purported misrepresentation.  (*See* Spencer Mem. 12–23; Stein Mem. 13–15.)  Stein makes the additional argument that the Amended Complaint also fails to plausibly and particularly allege control person liability as to Stein.  (*See* Stein Mem. 16–18.)

### a.  The Scope of § 10(b) and Rule 10b-5

Generally, "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (citation and quotation marks omitted).  In the face of "unpredictable and inconsistent application of § 10(b) to transnational cases," the Supreme Court concluded that § 10(b) and, a fortiori, Rule 10b-5 do not apply "extraterritorially."  *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 260, 265 (2010).  In doing so, the Supreme Court specifically criticized the Second Circuit's prior approach of creating a two-step analysis asking "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens" and "whether the wrongful conduct occurred in the United States."  *Id.* at 257 (citation and quotation marks omitted).  Instead, the Supreme Court ruled that the focus of the Act was "not upon the place where the deception originated, but upon purchases and sales of securities in the United States."  *Id.* at 266.  "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange

or any security not so registered.'" *Id.* at 267 (citation omitted). As for securities not registered on domestic exchanges, the Supreme Court instructed that the "exclusive focus" of the Act is on "*domestic* purchases and sales." *Id.* at 268 (emphasis in original) (footnote omitted).

The Second Circuit has interpreted the Supreme Court's instructions to mean that, for securities not listed on domestic exchanges, transactions are considered domestic and fall within the scope of the Act "if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). That is, because the "act of purchasing or selling securities is the act of entering into a binding contract," the Second Circuit interprets the sale to have occurred "when the parties become bound to effectuate the transaction." *Id.* (quotation marks omitted). Therefore, "in order to adequately allege the existence of a domestic transaction, it is sufficient for plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68. Sufficient factual allegations may include "facts concerning . . . the placement of purchase orders, the passing of title, or the exchange of money," but a "mere" conclusory "assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions." *Id.* at 70.

Importantly, however, although the existence of a domestic transaction or listing is "*necessary* to state a claim under § 10(b), a finding that these transactions were domestic would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic." *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (emphases in original) (footnote omitted). In *Parkcentral*, the Second Circuit declined

to apply the Act to allegedly manipulative and deceptive trading practices based on securities-based swap agreements because although the swap agreements "may have been concluded domestically, the . . . shares they referenced appear[ed] to trade only on foreign exchanges." *Id.* at 207. The allegedly deceptive conduct there—public statements regarding the defendant's intention not to acquire certain shares—was also alleged to have occurred "primarily in Germany." *Id.* The Second Circuit concluded that applying the Act to this situation would be contrary to the Supreme Court's instructions in *Morrison*, despite the existence of a domestic transaction, because "then it would subject to U.S. securities laws conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges, in the absence of any congressional provision addressing the incompatibility of U.S. and foreign law nearly certain to arise." *Id.* at 215–16. The Second Circuit acknowledged the particular nature of the facts in *Parkcentral* and instructed district courts to "carefully make their way with careful attention to the facts of each case and to combinations of facts that have proved determinative in prior cases" when determining whether a case is "impermissibly extraterritorial." *Id.* at 217.

Plaintiff first argues that the transaction is adequately pled as a domestic one because irrevocable liability was incurred in the United States. (*See* Pl.'s Spencer Mem. 4.) Irrevocable liability attaches "when the parties become bound to effectuate the transaction, that is when the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (citation and quotation marks omitted). Here, the transaction centers around the execution of the 2015 Subscription Agreement. (Am. Compl. ¶ 20.) Plaintiff, located in Bermuda, signed the 2015 Subscription Agreement and e-mailed it to Spencer, allegedly in New

York, who had not yet signed it. (*See id*.) Stein then allegedly signed the agreement on behalf of Spencer in New York on the same day, and the fully-executed agreement was returned by email to Plaintiff in Bermuda through a New York financial advisory firm. (*Id*.) The agreement, attached as Exhibit B to the Amended Complaint, specifies, however, that, "[u]pon receipt of the signed Subscription Agreement . . . and acceptance of [Plaintiff's] subscription by [Spencer] . . . , [Spencer] will notify [Plaintiff] of receipt *and acceptance* of [Plaintiff's] subscription." (2015 Subscription Agreement 2 (emphasis added).)[5] Moreover, the agreement specifically states that Spencer "reserves the right, *in its sole discretion, to accept or reject a subscription for any reason whatsoever*." (*Id*. (emphasis added).) Plaintiff does not allege that it received notification of Spencer's acceptance in the United States, nor can it, because Plaintiff is located in Bermuda. (*See* Am. Compl. ¶ 20.) And per the plain terms of the agreement, no liability existed on behalf of Spencer until this notification was clearly communicated to a prospective subscriber. (*See* 2015 Subscription Agreement 2.) Moreover, closing was further conditioned on, inter alia, Spencer delivering title (via "Investor certificates") to any prospective investors, on Plaintiff making payment for those shares, and on Spencer's delivery of certain "Related Documents" to Plaintiff (in Bermuda). (*Id*. at 11–12 (§§ 4.4, 4.6–8, 5.2).) Both Plaintiff's and Spencer's obligations, per the terms of the 2015 Subscription Agreement, were clearly conditioned on much more than Stein's countersignature (allegedly) in New York, given that § 4 is marked as "Conditions to the Investors' Obligations at Each Closing" and specifically states that each investor's "obligation . . . to purchase and pay . . . is subject to the fulfillment or waiver . . . *of the following conditions* . . . ." (*Id*. at 11 (emphasis added).) Similarly, § 5, labeled as

---

[5] For ease of reference, the Court refers to the ECF-stamped page numbers on the documents comprising Exhibit B of the Amended Complaint.

"Conditions to the Company's Obligations at Each Closing," reads that Spencer's obligations "are subject to the satisfaction . . . or before each Closing of each of the following conditions." (*Id*. at 12.)[6]  Simply countersigning the agreement did not deprive Spencer of the all-important right to "change its mind," *Giunta*, 893 F.3d at 81, especially given the broad, unfettered language clearly reserving Spencer's right, "in its sole discretion, to accept or reject a subscription *for any reason whatsoever*" placed within the agreement's Instructions to Investors, (2015 Subscription Agreement 2 (emphasis added)).  Nor does Plaintiff allege that "title passe[d] within the United States."  *Giunta*, 893 F.3d at 79 (citation omitted).  Therefore, it appears from the allegations that the underlying transaction was not a domestic one.[7]  Nevertheless, the Court does not need to rest its conclusion on this ground alone.

---

[6] Plaintiff's citations to an SEC Release and the Restatement (Second) of Contracts in support of its argument that Stein's countersignature was enough to incur irrevocable liability are not persuasive because "treatises . . . are . . . unavailing . . . [where, as here,] the parties intended from the outset that delivery of written confirmation is required to cr[e]ate a valid and enforceable contract."  *In re Adler, Coleman Clearing Corp.*, 218 B.R. 13, 25 (S.D.N.Y. 1998) (citations omitted); *see also Chambers v. Manning*, 169 F.R.D. 5, 7 (D. Conn. 1996) ("The parties' intentions are determined from the contract language." (citation omitted)).  Moreover, nothing suggests that liabilities were incurred prior to consummation of the 2015 Subscription Agreement because there are no allegations suggesting that there was a binding, "preliminary" agreement that the 2015 Subscription Agreement merely sought to "memorializ[e] . . . in a formal document."  *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04-CV-1621, 2005 WL 1377853, at *5 (S.D.N.Y. June 9, 2005) (citations and quotation marks omitted).

[7] Plaintiff repeatedly refers to the conditions in the agreement as conditions "subsequent." (Pl.'s Spencer Mem. 5.)  There is some precedent suggesting that "the existence of conditions necessary to closing [a] transaction abroad, [such as] foreign approval," may not necessarily bar the existence of irrevocable liability.  *See Giunta*, 893 F.3d at 81 (citation omitted).  However, in those cases, there were also terms expressly dictating that a party or multiple parties "no longer had the discretion to revoke acceptance" at that point in the transaction.  *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 543 (S.D.N.Y. 2013); *see also Atlantica Holdings, Inc. v. Sovereign Wealth Funds Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 561 (S.D.N.Y. 2014) (citing a portion of the agreement that specifically stated when the purchases became irrevocable *unless* certain adverse actions took place).  None of these involved the circumstances present here, where the 2015 Subscription Agreement provided Spencer with "sole discretion" to reject Plaintiff's (or any other investor's) subscription.  (2015 Subscription Agreement 2.)

Even if the Court were to assume the transaction was domestic, "such a transaction is not alone sufficient to state a properly domestic claim under the statute." *Parkcentral*, 763 F.3d at 215. Here, the allegations collectively describe a transaction so foreign that it is impermissibly extraterritorial to bring it within the purview of § 10(b).

To begin, the Parties are Bermudan. Plaintiff is a Bermudan company with its principal place of business in Bermuda. (Am. Compl. ¶ 5.) Plaintiff purchased shares of Spencer, which is also a Bermudan company. (*Id*. ¶ 6.) Although Plaintiff alleges that Spencer's principal place of business is New York, this is solely based on Plaintiff's understanding that Stein and other executive officers live in New York, on Enstar's communications with Stein through a "212" area code, a post-transaction meeting that occurred in New York, and a New York address listed on "archived pages" of Spencer's website from before the restructuring of the entity, which occurred in November 2016. (*Id*.) But these minimal connections with the United States do not defeat the argument that the transaction is predominantly foreign because the "presumption against extraterritoriality" as to the application of § 10(b) "cannot evaporate any time *some* domestic activity is involved in the case." *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019) (emphasis in original) (citation and quotation marks omitted); *see also In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 918 (S.D.N.Y. 2018) (same). Other, material details, such as the identity of the entities and the foreign nature of the security interests themselves are connected to Bermuda and not the United States. *See Parkcentral*, 763 F.3d at 207 (noting that even if some of the swap agreements "concluded domestically," the fact that the underlying shares traded "only on foreign exchanges" weighed in favor of determining that it was extraterritorial in nature). Moreover, Plaintiff has made no allegation that the purportedly "misleading statement[] at issue" here "occurred in the United States." *Prime Int'l*

*Trading*, 937 F.3d at 106.  Although Stein is alleged to have made the relevant statement from New York over a telephonic meeting, those statements were directed to and had their impact on Enstar, Plaintiff's governing entity, in Bermuda.  (*See* Am. Compl. ¶ 14.)[8]  Indeed, this statement directed towards Enstar and/or Plaintiff in Bermuda is even less widespread than the purported misrepresentation in *Parkcentral*, which the Second Circuit acknowledged was alleged to "have been intended to deceive investors worldwide."  763 F.3d at 216.  Finally, the 2015 Subscription Agreement was signed by Plaintiff in Bermuda, and title was delivered to Plaintiff in Bermuda.  (*See id.* ¶¶ 19–20.)  *See Absolute Activist*, 677 F.3d at 69–70.

"Under Plaintiff['s] reading, a course of conduct that is entirely foreign—undertaken by foreign actors, executed in foreign transactions, and intended to have an impact primarily on foreign interests—could be deemed domestic, and subject to U.S. law" merely because certain executive officers of Spencer live in New York and because certain communications originated from a New York phone number.  *In re London*, 332 F. Supp. 3d at 918 (citation omitted).  This does not conform with a proper reading of the Supreme Court's analysis of the Act in *Morrison* or the Second Circuit's subsequent interpretation in *Parkcentral*.  Accordingly, the Court finds that, even if the transaction at issue were considered domestic, Plaintiff's claims are "so predominantly foreign as to be impermissibly extraterritorial."  *Parkcentral*, 763 F.3d at 216; *see also Prime Int'l Trading*, 937 F.3d at 106–07 (concluding that, even assuming certain trades

---

[8] Although Plaintiff alleges that the Parties once had a business meeting in New York, the meeting is alleged to have occurred six months *after* the transaction had already been consummated and was called for the purpose of discussing already-present "issues" with the transaction.  (Am. Compl. ¶ 6.)  Accordingly, this meeting does not add weight to Plaintiff's position that the transaction or misrepresentation itself was not impermissibly foreign.  *Cf. Giunta*, 893 F.3d at 76–77, 82–83 (describing how several telephone and in-person conversations in which the defendant who was alleged to have made material misrepresentations occurred entirely within Manhattan).

occurred domestically, the allegations were nevertheless predominantly foreign); *In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 309 (S.D.N.Y. 2017) (holding, even in the face of allegations that certain derivatives were traded domestically, that the defendants' allegedly "manipulative and misleading" conduct was directed to the plaintiffs in London and concerned extraterritorial securities interests). Therefore, the Court dismisses Plaintiff's § 10(b) and Rule 10b-5 claims.[9, 10]

---

[9] The Court acknowledges that the transaction at issue here is generally much simpler than the securities-based swap agreements in *Parkcentral* and other cases adjudicating the foreign-ness of complex derivative trading. *See* 763 F.3d at 201–02. Nevertheless, this Court applies the principles underlying the Second Circuit's holding in *Parkcentral* and the Supreme Court's holding in *Morrison* to conclude that the allegations still constitute a predominantly foreign transaction because the most determinative allegations, such as the nationalities of the entities, the securities in controversy, and the location where the purported misrepresentation had its impact, create more of a nexus with Bermuda than with the United States.

The Court finds the approach of some courts within this district—not to follow *Parkcentral* where the security transaction is different from the one specifically discussed in *Parkcentral*—too narrow. *See, e.g.*, *In re Platinum & Palladium Antitrust Litig.*, No. 14-CV-9391, 2017 WL 1169626, at *27, n.13 (S.D.N.Y. Mar. 28, 2017). In *Parkcentral*, the Second Circuit explicitly instructed district courts to "make their way with careful attention to the facts of each case and to combinations of [determinative] facts . . . so as eventually to develop a reasonable and consistent governing body of law on this elusive question." 763 F.3d at 217.

[10] Although Plaintiff cites *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60 (2d Cir. 2018) in its Opposition, (*see* Pl.'s Spencer Mem. 5–6), this case is not instructive here. In *Choi*, the Second Circuit noted that the trading practice at issue was alleged to be "binding" at the moment that a bidder "matched" on the "KRX night market trades" it was interested in. 890 F.3d at 67. In that case, "[n]othing in the amended complaint or elsewhere suggest[ed] that a trading party may unilaterally revoke acceptance following matching on" the trading platform. *Id*. This is not the circumstance here, where, as discussed above, the 2015 Subscription Agreement and the related allegations do allow for unilateral revocation and call for the performance of a number of conditions before liability incurs and/or before title is transferred. In *Choi*, the electronic trading platform where the trades were "matched" was also alleged to be located in Illinois, and there were no allegations tying the platform itself to a foreign country at all. *Id*. at 63, 65, 68. The same cannot be said of the instant Action.

### b. Control Person Liability Claim

Because the Court has determined that no viable § 10(b) claim exists, it follows that no control person liability claim survives either. "In the absence of plausible pleading of a primary violation, Plaintiff cannot state a claim under [§] 20(a)." *Jackson v. Halyard Health, Inc.*, No. 16-CV-5093, 2018 WL 1621539, at *10 (S.D.N.Y. Mar. 30, 2018); *see also In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) ("A plaintiff must first plead facts showing a primary violation of the securities laws by the allegedly controlled person." (citations omitted)); *Brown v. Hutton Grp.*, 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) ("[I]t is impossible to state a claim for secondary liability under [§] 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party." (citations omitted)). Accordingly, Count III of the Amended Complaint is also dismissed.

### c. Section 29(b) Claim

Section 29(b) requires Plaintiff to show, inter alia, that the contract at issue involved a "prohibited transaction" and that Plaintiff is "in the class of persons the Act was designed to protect." *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (citation and quotation marks omitted). Because the Court has concluded that Plaintiff's § 10(b) claim is outside of the scope of the Act due to its mostly foreign connections, it follows that Plaintiff is not "in the class of persons the Act was designed to protect." *Id.* (citation and quotation marks omitted); *see also Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573, 583 n.8 (S.D.N.Y. 2011) ("As [the plaintiff] has failed to plead any

underlying . . . violation [of the Act] against [a defendant], [the plaintiff's] claim for rescission against [the defendant] must therefore be dismissed.").

In the face of arguments attacking the sufficiency of Plaintiff's allegations on certain individual elements of Plaintiff's § 10(b) claims, (*see* Spencer Mem. 12–23), Plaintiff appears to argue that even if its § 10(b) claim fails, a § 29(b) claim would nevertheless survive because § 29(b) provides a "separate private cause of action," under which a plaintiff should not need to plead every element of the underlying violation supporting a claim for rescission under § 29(b), (Pl.'s Spencer Mem. 11). Because the Court dismisses the § 10(b) claim on jurisdictional grounds, i.e., that the Act does not *reach* Plaintiff's claim due to its mostly foreign nature, this counterargument fails outright. Plaintiff's arguments regarding whether it was obligated to plausibly allege reliance and causation—two requisite elements of § 10(b) and Rule 10b-5 claims—to establish a § 29(b) claim do not address the core, fundamental deficiency identified by this Court's analysis because instead of addressing the merits of the claim, the Court has dismissed the claim based on its ability to hear the case *at all*.

In any event, Plaintiff's cited cases to support the notion that a § 29(b) claim may still exist outside of an adequately pled § 10(b) claim are inapposite. For example, *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968) and *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982), both pertain to § 29(b) claims premised on underlying violations of § 15(a)(1), not § 10(b). *See* 678 F.2d at 556; 391 F.2d at 360–61. Moreover, in *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001), the Third Circuit concluded that a securities plaintiff in a § 29(b) action may not need "to prove reliance and damages" in a *market manipulation* claim, where reliance and damages is ordinarily "reflected in the stock's price movement." *Id.* at 206 n.6. Plaintiff's claim here is not based on

market manipulation.  And, in the same opinion, when the Third Circuit analyzed the plaintiff's

separate, distinct basis for rescission under a *securities fraud* argument, it listed all the elements

of a securities fraud claim under § 10(b) and Rule 10b-5 and specifically noted that the plaintiff

"must establish genuine issues with respect to the following elements: omissions of material fact,

*reliance*, cognizable injury, and scienter."  *Id*. at 212–13 (emphasis added) (footnote omitted).

Moreover, Plaintiff acknowledges that the Second Circuit has not issued any analogous ruling,

(Pl.'s Spencer Mem. 13), and in the absence of such guidance, this Court sees no reason to hold

that § 29(b), which explicitly premises rescission on the existence of a "violation of[] any

provision of [the Act]," could somehow create a separate cause of action allowing a plaintiff to

circumvent the pleading requirements of the underlying violation itself, 15 U.S.C. § 78cc(b).

Therefore, even to the extent Plaintiff's argument regarding the "free-standing" nature of a

§ 29(b) claim is applicable to the Court's jurisdictional holding, the relevant statute and cited

caselaw fail to support Plaintiff's view of how such a claim is legally cognizable.[11]

### III.  Conclusion

For the foregoing reasons, Spencer and Stein's Motions to Dismiss are granted, and

Plaintiff's claims are dismissed.  Because Plaintiff is counseled and has already had an

opportunity to amend in face of similar arguments from Defendants, (*see* Dkt. Nos. 22–23), the

Court dismisses the claims with prejudice, *see Elek v. Incorporated Village of Monroe*, 815 F.

Supp. 2d 801, 810 n.8 (S.D.N.Y. 2011) ("[B]ecause Plaintiff's second bite at the apple has

proven fruitless, the Court dismisses this [A]ction." (collecting cases)); *In re Worldcom, Inc.

Secs. Litig.*, No. 03-CV-6225, 2004 WL 2889974, at *8 (S.D.N.Y. Dec. 15, 2004) ("Under Rule

---

[11] Because the Court has dismissed Plaintiff's claim on grounds that it is impermissibly
extraterritorial, at this time, the Court does not reach the arguments regarding whether Plaintiff
sufficiently pled specific elements of a § 10(b) claim.

15(a) plaintiffs have no right to amend their pleadings a second time." (citation and quotation

marks omitted)).

The Clerk of the Court is respectfully requested to terminate the pending Motions, (Dkt.

Nos. 29, 32), and close this case.

SO ORDERED.

Dated: March 24, 2020
      White Plains, New York

_____
      KENNETH M. KARAS
     United States District Judge